317 Ga. 87
FINAL COPY

S23A0588.  MORRIS v. THE STATE.

COLVIN, Justice.

Appellant Jerrontae Morris was convicted of malice murder and related crimes in connection with the November 2015 shooting of a vehicle occupied by Anthony Lundy and Demeco Person, which fatally wounded Lundy.[1]  On appeal, Appellant contends that the

---

[1] The crimes occurred on November 16, 2015.  In April 2016, a Fulton County grand jury indicted Appellant and his co-defendant, Allen Jones, in a nine-count indictment.  On September 27, 2016, the grand jury issued a superseding indictment, which added counts against Percy Small and Cardeall Lackey.  Appellant, Jones, and Small were charged with the malice murder of Lundy (Count 1), the felony murder of Lundy predicated on aggravated assault and criminal damage to property (Counts 2 & 3), the aggravated assault of Lundy (Count 7), the aggravated assault of Person (Count 8), criminal damage to property (Count 9), and possession of a firearm during the commission of a felony (Count 10).  Appellant and Small were also charged with the felony murder of Lundy predicated on possession of a firearm by a convicted felon (Count 4 – Appellant, Counts 5 & 6 – Small) and possession of a firearm by a convicted felon  (Count 13 – Appellant, Counts 14 & 15 – Small).  Lackey was indicted for tampering with evidence (Count 11) and making false statements (Count 12) but was not charged with participating in the murder or the aggravated assaults.  Appellant was jointly tried before a jury with Jones and Small from October 15 through 25, 2019.  The jury found Appellant guilty of all counts.  The jury acquitted Small and Jones of the murder charges but found them guilty of two counts of aggravated assault and one count of possession of a firearm during the commission of a felony.  The jury also found

evidence was insufficient as a matter of constitutional due process to sustain his conviction for malice murder because the State failed to prove that Appellant proximately caused the victim's death and did not prove that Appellant either conspired with his co-defendants to commit the crime or was a party to the crime. Appellant also contends that the evidence was insufficient as a matter of Georgia statutory law to sustain his conviction for malice murder because the trial evidence was circumstantial and the State failed to exclude every reasonable hypothesis other than his guilt.[2] We affirm for the

---

Small guilty of two counts of possession of a firearm by a convicted felon. Appellant was sentenced as a recidivist, pursuant to OCGA § 17-10-7 (a) & (c), to life in prison without parole for malice murder (Count 1), 20 years consecutive for the aggravated assault of Person (Count 8), ten years consecutive for criminal damage to property (Count 9), ten years consecutive for possession of a firearm during the commission of a felony (Count 10), and five years consecutive for possession of a firearm by a convicted felon (Count 13). All remaining counts were either vacated by operation of law or merged for sentencing purposes. Appellant filed a timely motion for new trial on November 5, 2019, which was amended through new counsel on September 20, 2022. After a hearing, the trial court denied the motion as amended on December 15, 2022. Appellant filed a timely notice of appeal. The case was docketed to this Court's April 2023 term, and oral argument was held on May 17, 2023.

[2] Appellant also challenges the sufficiency of the evidence supporting his felony murder charges. However, because the felony murder counts were vacated as a matter of law, Appellant's claims as to the felony murder counts are moot. See *Snipes v. State*, 309 Ga. 785, 788 (1) n.2 (848 SE2d 417) (2020).

reasons set forth below.

1. Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. On the evening of November 16, 2015, Person drove Lundy in Person's work vehicle, a white Dodge Caravan, to a birthday party in the College View Hills apartment complex in College Park. Although Lundy had been to the apartment earlier that day, Lundy and Person had trouble finding the apartment once they approached the complex because "it was too dark." As Lundy and Person continued "riding around" the apartment complex looking for the apartment, they passed a crowd of people standing together outside and then saw "a dude standing in the middle of the street" blocking their path. Person stopped the vehicle because the man "gave . . . a look like he didn't want to get out of the street." Person then recognized the man as Allen Jones, with whom he had played football when they were younger. Jones walked along the driver's side, "look[ed] in the van," and "look[ed]

---

"We thus limit our review to the sufficiency of the evidence presented at trial regarding the malice murder count." Id.

3

dead at [Person]." Jones never said anything, and Person and Lundy then "rolled off" in the van. Person drove around the block to "look for a parking spot" and came upon a church located across the street from the apartment complex. Person parked in the church's empty parking lot because he felt uneasy and "didn't want to park in the apartments, period."

Person and Lundy exited the van and began walking toward the apartment complex to look for the apartment. As they were looking for the apartment, a man from across the street, later identified by officers as Reco Smith, started "talk[ing] loud[ly]" to them, asking, "Y'all straight, y'all good, y'all lo[st]?" Person responded, "We straight, appreciate it," and told Lundy that they should "get [back] to the van."

Once Person and Lundy returned to the van, Lundy convinced Person to try again to find the apartment. Person drove them back through the complex and stopped for "a hot second" in front of one of the apartments located at the intersection of Atlanta Street and Simmons Avenue. Person then heard multiple gunshots, heard

4

Lundy scream, and saw Lundy "grab his neck" and "start[ ] rocking back and forth." Person began driving as "fast as [he] c[ould]" away from the apartment complex. As Person drove away, he called 911 to report that Lundy had been shot. The 911 operator directed Lundy to drive to a nearby convenience store, and officers were dispatched to the location.

Upon arriving at the store, officers found Lundy slouched in the front passenger seat of the van. Lundy was "not conscious, not breathing, and not responsive." In Lundy's hand was his phone, which showed the GPS directions to the apartment where the birthday party was taking place. The State's medical examiner later testified that Lundy's cause of death "was a gunshot wound of the right arm into the chest." Officers observed that the van had a bullet defect and a shattered right rear window, which Person's employer later confirmed was "new damage." Person told officers that he had not seen the shooter but reported seeing Jones in the middle of the road right before the shooting occurred.

The College Park Police Department received several calls that

5

evening between 7:30 and 8:00, reporting that bullets had been fired at the intersection of Atlanta Street and Simmons Avenue. Witnesses reported hearing "about 10 to 12" gunshots that were fired from multiple guns because the sounds of the gunshots "were not consistent" and some shots were "not as loud" as others. Witnesses also reported seeing the white van leave the apartment complex immediately after the gunshots occurred. However, many of the witnesses were unwilling to identify themselves and would only speak "off record."

Based on several anonymous sources, officers were able to identify Percy Small as a person of interest in the shooting. Detective Jermeir Jackson Stroud interviewed Small a total of three times. Small gave inconsistent reports about his involvement in the shooting. But, in his third interview, which was video-recorded and played for the jury, Small admitted that, right before the shooting, he had been standing outside Jones's grandmother's apartment with a group of people "chillin[g]," "smoking," and "drinking," when he saw the white van drive through the complex. According to

6

Small, Smith then drove by and warned the crowd to "be careful" of the men in the white van because they were "in all black" and "look[ed] like they [were] trying to rob or something."[3] Small then asked Cardeall Lackey, who was in the crowd, to borrow his ".40 or .45" caliber handgun, before walking toward the van with Appellant, Jones, and Dejuan Grier. The men saw the van stop in the middle of the street at the intersection of Atlanta Street and Simmons Avenue, like the drivers "ain't know which way they wanted to go, like they was lost or whatever." Small stated that he then fired warning shots "in the air about two times," but that "[Appellant] just . . . went loose" shooting at the van. Small further stated that the fatal bullet "had to come from [Appellant's] gun." Small told Detective Stroud that he thought Grier had with him a ".38 special," but he "c[ouldn't] really say" whether Grier "shot or not," and that Appellant, Grier, and Jones all had guns that looked "the same." Small also stated that, the day after the shooting, Appellant told him

[3] On the night of the shooting, Lundy was wearing dark blue jeans and a black hooded sweatshirt. Person was wearing black pants and a black sweatshirt.

that the men in the van "shouldn't a been coming through here like that. . . . They come up here again [indiscernible], I'll do it again." Moreover, Small stated that, during this conversation, Appellant mentioned that, after the shooting, Grier was "fired up" about someone "ow[ing] him some money."[4]

Detective Stroud also interviewed Grier. During the interview, which was video-recorded and played for the jury, Grier stated that, right before the shooting, he was near the intersection of Atlanta Street and Simmons Avenue with Appellant, Small, and Jones when he saw the van stop. Grier then saw Small and Jones "start[ ] shooting in the air," while Appellant "ran[ ] up on the van, and started shooting." Grier admitted that he "pull[ed] [his] gun out" and "tr[ied] to fire in the air" but said that the gun "didn't fire" because it "really didn't work." Grier stated that, right after the shooting occurred, he saw the man who sold him the gun and started "fussing and cussing" and asking the man for "[his] money back."

---

[4] Small provided a written statement consistent with his verbal account of events.

8

Grier further stated that he "loved" Appellant "like [his] little brother," but that, "if anybody shot [Lundy], it was [Appellant]" because Appellant "was the closest [to the van]" and "the only one [who] could've been accurate enough to hit [the van]."[5]

Appellant was arrested on February 3, 2016, at which time Detective Stroud interviewed him about his involvement in the shooting. Appellant denied any involvement, stating that he heard the gunshots while he was inside his house playing video games and talking on the phone with a man he referred to as "Uncle Frank," whom Detective Stroud later identified as Franklin Pippins. However, the State introduced into evidence Appellant's cell phone records, which revealed that he was not on the phone with Pippins at the time of the shooting. Appellant further stated in his interview that his brother had previously traveled out of town and left Appellant with a "little .38 revolver," but Appellant claimed that his brother "actually got the gun [back] before [the shooting] even

---

[5] Although Grier recanted his pretrial statements at trial, the State introduced a written statement Grier provided at the time of his interview, which was consistent with his interview statements.

9

happened."

Appellant made several calls while incarcerated at the Fulton County jail, which were recorded and played for the jury. During a phone call with his mother, Appellant stated that his friend, Jahmi, who Detective Stroud later identified as Jahmi Thompson, was holding "two guns" for him — "a .357 . . . Ruger" and "a revolver." Detective Stroud later received the Ruger .357 Magnum from Thompson's attorney. However, the revolver Appellant referenced in his call was never recovered.

The State's ballistics expert testified that the bullet retrieved during Lundy's autopsy was a ".38 class" that could have been fired from several different firearm models, including "a .38 special and .357 Magnum revolver." However, she determined that the retrieved bullet "could not have been fired" from the recovered Ruger .357 Magnum because the bullet and Ruger contained "two different types of rifling."

2. Appellant contends that the evidence was insufficient as a matter of constitutional due process to sustain his conviction for

malice murder because the State failed to prove that Appellant proximately caused the victim's death or that Appellant either conspired with his co-defendants to commit the crime or was a party to the crime. According to Appellant, because the State's ballistics expert testified that Appellant's Ruger .357 Magnum did not fire the fatal bullet, Appellant's act of shooting could not have been the proximate cause of Lundy's death. Therefore, Appellant argues, the State had to prove either that Appellant conspired with his co-defendants to commit the murder or that Appellant was a party to the crime, which it failed to do. Appellant's claim fails because there was sufficient evidence for the jury to conclude that Appellant fired the fatal bullet and thus that Appellant's act of shooting at the van was the proximate cause of Lundy's death.

When evaluating the sufficiency of evidence as a matter of constitutional due process, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III)(B) (99 SCt 2781, 61 LE2d 560) (1979). This Court will uphold the

11

jury's guilty verdict "[a]s long as there is some competent evidence, even if contradicted, to support each fact necessary to make out the State's case." *Scott v. State*, 309 Ga. 764, 766 (1) (848 SE2d 448) (2020) (citation and punctuation omitted). To sustain a conviction for malice murder, the State must prove beyond a reasonable doubt that the defendant's actions were the proximate cause of the victim's death. See *Taylor v. State*, 303 Ga. 624, 627 (1) (814 SE2d 353) (2018) ("Proximate cause is the causation standard for murder cases.").

> Where one inflicts an unlawful injury, such injury is to be accounted as the efficient, proximate cause of death, whenever it shall be made to appear, either that (1) the injury itself constituted the sole proximate cause of the death; or that (2) the injury directly and materially contributed to the happening of a subsequent accruing immediate cause of the death; or that (3) the injury materially accelerated the death, although proximately occasioned by a pre-existing cause.

*Stribling v. State*, 304 Ga. 250, 253 (1) (818 SE2d 563) (2018) (citation and punctuation omitted). "[W]hat constitutes proximate cause is undeniably a jury question and is always to be determined on the facts of each case upon mixed considerations of logic, common

12

sense, justice, policy, and precedent." *Robinson v. State*, 298 Ga. 455, 458 (1) (782 SE2d 657) (2016) (citation and punctuation omitted).

Here, the trial evidence was sufficient to authorize the jury to conclude that Appellant proximately caused Lundy's death by firing the fatal bullet. The jury viewed video recordings from the interviews of Small and Grier, during which they stated that the fatal bullet "had to be fired from [Appellant's] gun" because he "was the closest to the van," "had a better shot than anybody," and, unlike Small and Jones, "went loose," shooting at the van rather than "in the air." Moreover, although the trial evidence established that Appellant's Ruger .357 Magnum did not fire the .38 caliber bullet that killed Lundy, the jury was aware of Appellant's own statements that he had both a "Ruger" and a "revolver," which he said he had given to Thompson before being arrested, and that, at some point in time, he had his brother's "little .38 revolver." Thus, the jury was authorized to disbelieve Appellant's theory that he did not fire the fatal shot and instead conclude that Appellant's action of firing at

13

the van proximately caused Lundy's death. See *Byron v. State*, 303 Ga. 218, 219 (1) (a), (b) (811 SE2d 296) (2018) (jury authorized to disbelieve the defendant's theory that "he was not the shooter" and find that he killed the victim, where witnesses "saw [the defendant] shoot at the victim" and "saw [the defendant] carrying the kind of gun that killed the victim"). Moreover, because the jury was authorized to conclude that Appellant fired the bullet that caused Lundy's death, the State was not required to prove that Appellant acted in concert with his co-defendants as a party to the crime. See OCGA § 16-2-20 (b) (1) (providing that a person is concerned in the commission of a crime if he "[d]irectly commits the crime"). Nor was the State required to prove that Appellant conspired with his co-defendants to commit Lundy's murder as Appellant was not charged with conspiracy, and conspiracy is not an essential element of malice murder. See OCGA § 16-5-1 (a), (b). See also *Romer v. State*, 293 Ga. 339, 341 (1) (b) (745 SE2d 637) (2013) (explaining that the State is only required to prove the essential elements of the charged crime).

3. Appellant also contends that the evidence was insufficient as a matter of Georgia statutory law to sustain his conviction for malice murder because the evidence did not exclude all reasonable hypotheses other than Appellant's guilt. Specifically, Appellant argues that the State was required to prove that Grier's revolver, which Small identified as a .38 special, was not the gun from which the fatal bullet was fired. Appellant's claim fails.

"To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. However, "not every hypothesis is a reasonable one, and the evidence need not exclude every *conceivable* inference or hypothesis — only those that are reasonable." *Graves v. State*, 306 Ga. 485, 487 (1) (831 SE2d 747) (2019) (citation and punctuation omitted; emphasis in original). "Whether alternative hypotheses are reasonable . . . is principally a question for the jury, and this Court will not disturb the jury's finding unless it is insupportable as a matter of law." *Robinson v.*

15

*State*, 309 Ga. 729, 731 (1) (a) (848 SE2d 441) (2020).

Here, even assuming that Appellant's conviction for malice murder was based solely on circumstantial evidence and thus that the trial evidence needed to exclude every reasonable hypothesis other than Appellant's guilt to sustain his murder conviction, we conclude that the jury was authorized to reject as unreasonable Appellant's alternative hypothesis that Grier fired the fatal bullet. The jury heard both Grier's and Small's interview statements that Appellant was the "closest" person to the van, and that, unlike Small and Jones, Appellant shot at the vehicle rather than in the air. The jury also heard Grier's statement that he attempted to shoot his revolver in the air but that his gun would not fire. Further, the jury heard Grier's statement that, after the shooting, he was "fussing and cussing" at the man who sold him the gun, asking for "[his] money back" because "t[he] gun wouldn't work." That statement was consistent with Small's statement that, according to Appellant, Grier was "fired up" after the shooting about someone owing him money. Consequently, the trial evidence authorized the jury to

reject as unreasonable Appellant's only alternative hypothesis — that Grier fired the fatal bullet. Accordingly, this claim fails.

*Judgment affirmed. All the Justices concur.*

Decided August 21, 2023.

Murder. Fulton Superior Court. Before Judge Farmer.

*Lee & Ziegler, Konrad G. W. Ziegler*, for appellant.

*Fani T. Willis, District Attorney, Kevin C. Armstrong, Ruth M. Pawlak, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth C. Rosenwasser, Assistant Attorney General*, for appellee.