318 Ga. 412
FINAL COPY

S23A1034. LEE v. THE STATE.

PINSON, Justice.

Appellant David Wallace Lee was convicted of malice murder for the shooting deaths of Meghan Bowen and James Harden.[1] On appeal, Lee contends that (1) the evidence was insufficient to sustain his convictions as a matter of constitutional due process and under OCGA § 24-14-6; (2) the trial court erred by failing to grant a new trial on the general grounds; (3) the trial court abused its discretion by admitting certain testimony about Lee's possession of a gun similar to the murder weapon; (4) the trial court erred by failing to

---

[1] The crimes occurred on November 18-19, 2015. On January 25, 2016, a Coffee County grand jury indicted Lee for two counts of malice murder (Counts 1, 2), two counts of felony murder (Counts 3, 4), and violations of the Georgia Controlled Substances Act (Counts 5, 6). Lee was tried by a jury from October 16 to 19, 2017. The jury found Lee guilty of Counts 1-4. Counts 5 and 6 were nolle prossed. Lee was sentenced to consecutive sentences of life in prison without the possibility of parole for Counts 1 and 2. Counts 3 and 4 were vacated by operation of law. Lee filed a timely motion for new trial and amended that motion through new counsel several times. Following a hearing, the trial court denied Lee's motion on March 10, 2023. Lee filed a timely notice of appeal. The case was docketed to the August 2023 term of this Court and submitted for a decision on the briefs.

disqualify an assistant district attorney; and (5) his trial counsel provided ineffective assistance by: (a) failing to review evidence of allegedly exculpatory cell phone data; (b) failing to review evidence related to Chris Bowen ("Chris"), Bowen's ex-husband; (c) failing to review discovery evidence and cross-examine certain witnesses about an earlier incident when Lee allegedly shot a man named Joey Taylor in the ankle; (d) failing to effectively cross-examine the State's witnesses about the lack of physical evidence and the time-line of the night of the murders; (e) failing to object to the admission of certain text messages based on testimony from a non-expert GBI agent; (f) failing to renew his motion for change of venue; and (g) failing to provide Lee with all the discovery before trial.

Each claim fails. The evidence was sufficient to support Lee's convictions, and the trial court applied the correct standard in deny-ing Lee's motion for new trial on the general grounds. And the trial court did not abuse its discretion in admitting testimony about Lee's possession of a gun similar to the murder weapon or by failing to disqualify the assistant district attorney absent an actual conflict of

interest. Lee also failed to show that he received constitutionally ineffective assistance of counsel. So we affirm his convictions and sentence.

1. The evidence at trial showed the following.

(a) Lee and Bowen were in a relationship that many witnesses described as tumultuous. A number of witnesses testified about incidents of threats or violence in the relationship: Bowen's father recalled that throughout Bowen's relationship with Lee, she would have "busted" lips and bruises. One friend, Brittany O'Neal, testified that on several occasions Bowen had sent her photos of "a gash on her head" and "bruises all over her body." Another friend recalled a time when Lee accused Bowen of cheating on him and, according to Bowen, "punched her in the crotch." And several friends recalled Bowen telling them about times when Lee kicked, hit, choked, or threatened to kill her. In one such incident in late summer 2015, Lee stuck a gun in Bowen's mouth, put her in his car, and drove her around "all night" threatening to kill her and telling her he would "put [her] body in a well and they'd never find [her]."

In the months before the murders, the violence in Lee and Bowen's relationship escalated. Bowen moved in with Lee in late August 2015. On that day, just before Bowen brought her belongings to Lee's house, Lee called her, cursed at her over the phone, and told her not to come. When Bowen and a friend arrived at Lee's house, Lee came out of the house with a long barrel gun, ran toward the friend's car, stopped five or ten feet away, and fired the gun over the top of the car.

A little over a week later, Lee called the police to ask about removing Bowen's property from his house. On the call, Lee admitted to breaking the windows of Bowen's van. A responding deputy saw that Lee had used a drill to break Bowen's windows and windshield. The deputy arrested Lee for trespassing.

Soon after that incident, Bowen moved out of Lee's house and into a mobile home about a mile away. On November 1, Lee went to Bowen's mobile home, took away her phone, and tried to get inside. Bowen shut the door on Lee, but Lee attempted to break in with an axe. Bowen and her five-year-old daughter escaped out the back door

and hid in the woods. As they hid, Lee again broke all her car windows. After this incident, Lee called Bowen's father and the police and told them that someone else had damaged Bowen's car and door. Bowen later texted a friend: "I'll get a [temporary protective order] if needed. I hate that it's this way. I told him I don't feel safe with him . . . ." Three days later, on November 4, Bowen got a temporary protective order against Lee. Afterward, on separate occasions, Bowen saw Lee drive by her home "a lot" and once saw him standing in her back yard shooting a gun into the air.

Lee also sent Bowen a number of threatening messages. On November 17, Lee texted Bowen, "Don't let me catch [you] with somebody else." The next day, Bowen had lunch at a restaurant with a friend, Trey Adams. Lee's daughter saw them there and texted Lee. Lee then called Bowen and asked her, "who the f**k are you with," and called her a "f**king whore." Bowen told Lee that she was with Adams. Lee responded, "B***h, I'm going to f**k you up," and "Motherf**ker, I'm going to f**k [Adams] up, too." About ten minutes later Lee texted Bowen, "You are one trash b***h. Am so

done, b***h . . . . You got it coming."

That night, James Harden went to Bowen's house around 9:00 p.m. A half hour later, Adams called to check on Bowen, who said she was fine and that she would see him the next day. At 10:18 p.m., Lee texted Bowen, "You at home??" He texted her again at 10:21 p.m., "U at home??" Bowen did not respond. At 10:22 p.m., Lee called Bowen with *67 to hide his number. She did not answer.

At around 11:30 p.m., a group of four people were sitting by a bonfire outside at a house "down the road" from Lee's house when they saw Lee drive by in a white Toyota truck. Lee drove by their bonfire twice that night. The first time he was "riding along" normally, but the second time he was speeding, or "hauling a**" and listening to "blaring" music.

Around 1:00 a.m. on November 19, Lee called the police and reported hearing gunshots that woke him up. Officers arrived at Lee's house around 2:00 a.m. Lee told the police he had been working in his shop until 9:00 or 9:30 p.m., went to sleep around 10:00 p.m., and woke up to the sound of gunshots.

In the morning, Bowen's father drove to Bowen's house. When he arrived, he found Bowen's front door open and a set of keys in the door. As he walked into the kitchen, he saw Harden's body lying in the doorway between the kitchen and the bedroom. He then saw Bowen lying in the bathroom on her back. Both were dead and had numerous gunshot wounds. Bowen's father immediately called 911.

That same day, GBI Agent Ben Collins interviewed Lee. At first the interview was about Lee's 911 call reporting the sound of gunshots outside his house. But Agent Collins then told Lee that "Bowen was deceased," and "within a couple of minutes" of hearing this, Lee asked, "was she shot with a pistol?" and "was she shot with a gun?" Lee explained that his last contact with Bowen was the day before the murders, on November 17, because "she had sent him a text message stating that she could not have contact with him anymore." That statement was belied by Lee's cell phone records, which showed he called and texted Bowen on the night of the murders.

(b) The State introduced evidence that Lee shot Bowen's friend, Taylor, at Bowen's house two weeks before the murders. On the day

of the shooting, Taylor stepped outside to smoke on Bowen's back steps, and saw Lee drive up to the house. Lee pulled a gun from his truck and fired "[s]even, eight, nine" shots at Taylor. One of the bullets struck Taylor's right ankle.

According to Taylor, Bowen told him not to call the police about the shooting because she did not want the Georgia Division of Family and Children Services or "the law" to get involved. Taylor was taken to a hospital, but he honored Bowen's wishes and did not say that Lee had shot him at Bowen's home. Instead, he claimed he had shot himself. Nevertheless, the next day, Bowen told O'Neal that Lee had shot Taylor in the foot. But Lee claimed during his interview with Agent Collins on November 19 that he had not seen Taylor in three months. At trial, Taylor and O'Neal testified that Lee shot Taylor. Lee's own witness, Shonda Gillespie, testified to the same. And another witness testified that Lee told him that Taylor was struck in the "crossfire" between Lee and Bowen.

When Taylor heard that Bowen and Harden had been killed, he told police Lee had shot him in the ankle. Because the bullet was

8

still in Taylor's ankle, law enforcement had it removed and collected for comparison testing. That bullet was later determined to have been fired from the same gun as the bullets recovered from Bowen's and Harden's bodies. All the bullets also matched four .22-caliber shell casings that investigators found near Lee's home. Taylor said Lee shot him with a Ruger Mark II .22-caliber semi-automatic bull-barrel gun. But a firearms expert testified that it would be difficult to identify that gun at dusk or at night, when Taylor was shot. Another witness, Cam Fambrough, testified that about two years before the murders, he saw Lee with a .22-caliber pistol.

2. Lee contends that the evidence was not sufficient to support his convictions for malice murder as a matter of constitutional due process or under OCGA § 24-14-6.

(a) When evaluating a due process challenge to the sufficiency of the evidence, "we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." See *Peacock v. State*,

9

314 Ga. 709, 714 (2) (b) (878 SE2d 247) (2022) (citation and punctuation omitted). See also *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). In doing so, we "leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts." *Perkins v. State*, 313 Ga. 885, 891 (2) (a) (873 SE2d 185) (2022) (citation and punctuation omitted).

Applying that standard here, the evidence summarized above was sufficient for a rational trier of fact to find Lee guilty beyond a reasonable doubt of malice murder. Ample evidence showed that Lee had a history of abuse and jealousy toward Bowen, including his threats to kill Bowen in the months before the murders. The evidence also authorized the jury to conclude that Lee lied about where he was on the night of the murders: Lee told law enforcement that he was at home and went to sleep around 10:00 p.m., but the witnesses from the bonfire on Lee's street told police that they saw Lee

drive by twice that night around 11:30 p.m.[2] Finally, the evidence authorized the jury to find that Lee was the shooter: ballistics evidence showed that the person who shot Bowen and Harden also shot Taylor (and multiple witnesses testified that Lee shot Taylor), and Taylor and Fambrough both saw Lee with a .22-caliber gun—the kind of gun that the GBI firearm expert testified was the murder weapon. See *Smith v. State*, 315 Ga. 357, 359-361 (1) (882 SE2d 289) (2022) (evidence was constitutionally sufficient where two witnesses identified the defendant as holding a rifle near the victim and a firearms expert matched shell casings found at the crime scene and the bullet that killed the victim with a rifle found near the defendant's house). This evidence was constitutionally sufficient to support Lee's

---

[2] Some of the bonfire witnesses' testimony at trial deviated from this timeline, but the jury was authorized to believe the bonfire witnesses' prior statements to police and reject their inconsistent trial testimony. See *Watkins v. State*, 313 Ga. 573, 576-577 (2) (872 SE2d 293) (2022) (jury may credit witnesses' prior statements and discredit portions of their trial testimony) (citing *Agee v. State*, 311 Ga. 340, 343 (1) (857 SE2d 642) (2021) ("A prior inconsistent statement of a witness who takes the stand and is subject to cross-examination is admissible as substantive evidence." (citation and punctuation omitted)), and *State v. Hinton*, 309 Ga. 457, 462 (2) (847 SE2d 188) (2020) ("The trier of fact is not obligated to believe a witness even if the testimony is uncontradicted and may accept or reject any portion of the testimony." (citation and punctuation omitted))).

11

convictions. See id.

(b) Lee also contends that the evidence was entirely circumstantial and did not rule out his alternative theories that either Chris or Taylor committed the murders.

A conviction may rest on circumstantial evidence alone if that evidence "exclude[s] every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. However, "not every hypothesis is a reasonable one, and the evidence need not exclude every *conceivable* inference or hypothesis," only the reasonable ones. *Graves v. State*, 306 Ga. 485, 487 (1) (831 SE2d 747) (2019) (citation and punctuation omitted; emphasis in original). "The questions whether any alternative hypotheses are reasonable and whether the circumstantial evidence excludes any such hypotheses are for the jury." *Willis v. State*, 315 Ga. 19, 24 (2) (880 SE2d 158) (2022). Finally, "we will not disturb the jury's findings on those questions unless they are insupportable as a matter of law." Id. (citation and punctuation omitted).

The evidence here authorized the jury to reject Lee's

alternative hypotheses as unreasonable. As recounted above, the State presented ballistics evidence showing that the bullet found in Taylor's ankle was fired from the same gun as the bullets recovered from Bowen's and Harden's bodies, and all of the bullets matched four .22-caliber shell casings that investigators found near Lee's home. On appeal, Lee suggests Taylor could have shot himself in the foot and then shot Bowen and Harden with the same gun, but the jury could have rejected that hypothesis as unreasonable given the lack of any apparent motive for Taylor to shoot Bowen and Harden or any explanation for how matching .22-caliber casings ended up at Lee's home. And Lee suggests that Chris could have accidentally shot his friend Taylor in the foot and then later shot Bowen and Harden, but no evidence supported the theory that Chris shot Taylor, and Chris had an alibi for the murders—a witness, Gillespie, testified that she was with him until 1:00 a.m. the next morning. So the jury was authorized to reject this hypothesis as unreasonable. See *Morris v. State*, 317 Ga. 87, 94 (3) (891 SE2d 859) (2023) (jury was authorized to reject as unreasonable the alternative theory that

13

another person was the shooter where the jury heard testimony describing the circumstances of the shooting and multiple people told police that the defendant was the shooter).

3. Lee contends that the trial court committed reversible error when it failed to grant his motion for new trial because the verdict was contrary to the evidence and the principles of justice and equity and was decidedly and strongly against the weight of the evidence. This argument implicates the "general grounds" for obtaining a new trial. See OCGA §§ 5-5-20; 5-5-21. When the general grounds are properly raised in a timely motion for new trial, the trial court exercises broad discretion to sit as a "thirteenth juror" and consider matters typically reserved to the jury, including conflicts in the evidence, witness credibility, and the weight of the evidence. *King v. State*, 316 Ga. 611, 616 (2) (889 SE2d 851) (2023). The trial court did that here: the court expressly rejected Lee's general grounds claim, explaining that it independently reviewed the record and found the verdict was "not contrary to the evidence," "not decidedly nor strongly against the weight of the evidence," and "not contrary to

14

law and the principles of justice and equity." And the merits of a trial court's decision on the general grounds are not subject to our review—that decision "is vested solely in the trial court." Id. (citation and punctuation omitted). So Lee's claim that the trial court should have granted his motion based on the general grounds presents nothing for us to review.

4. Lee next contends that the trial court abused its discretion in admitting the testimony of Cam Fambrough because the evidence was not relevant and should have been excluded under OCGA § 24-4-403 ("Rule 403").

(a) Before trial, the State moved to introduce evidence concerning a 2013 incident when Lee went to Fambrough's home with a firearm that Fambrough described as a .22-caliber Browning Buck Mark. At the pretrial hearing, Fambrough testified that Lee came to his house in 2013 after Lee and Fambrough's son got into a "little tussle" earlier in the day and Fambrough's son hit Lee. According to Fambrough, Lee stood under Fambrough's carport with a gun in his holster and threatened to kill Fambrough's son. Fambrough

15

explained that he recalled that Lee had a .22-caliber "bull barrel" gun with a long barrel that looked like a Browning Buck Mark. The State argued that Fambrough's identification of Lee's gun was relevant because it matched the descriptions that Taylor and the firearms expert gave of the murder weapon. The trial court allowed the testimony but directed the State to limit questioning to whether Fambrough saw Lee with that same kind of gun in 2013. At trial, Fambrough testified that Lee had a ".22 pistol" with a "target barrel on it, bull barrel, whatever you call it," and did not go into the details of the interaction.

(b) Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401 ("Rule 401"). "'A trial court's decision whether to admit or exclude evidence is reviewed on appeal for an abuse of discretion.'" See *State v. Brinkley*, 316 Ga. 689, 690 (889 SE2d 787) (2023) (quoting *Martinez-Arias v. State*, 313 Ga. 276, 285 (3) (869 SE2d 501) (2022)).

The trial court did not abuse its discretion by concluding Fambrough's testimony was relevant under Rule 401. Because the firearms expert determined the victims were shot with a .22-caliber firearm and the murder weapon was not found, evidence of Lee's ownership of a .22-caliber firearm was relevant. *Wilson v. State*, 315 Ga. 728, 739 (8) (a) (883 SE2d 802) (2023) (video evidence of defendants "brandishing a gun of the same model as the murder weapon" was relevant); *Hanes v. State*, 294 Ga. 521, 524 (3) (755 SE2d 151) (2014) (evidence of the defendant's ownership of a gun "largely identical to the murder weapon in size, style, and brand" was relevant).

(c) Under Rule 403, "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Rule 403 is an extraordinary remedy, which should be used only sparingly, and the balance should be struck in favor of admissibility." *Harris v. State*, 313 Ga. 225, 232 (3) (869 SE2d 461) (2022) (citation and punctuation omitted). Thus, "in

reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." Id. (citation and punctuation omitted).

The trial court did not abuse its discretion in determining this testimony did not violate Rule 403. Fambrough's testimony was, at the direction of the trial court, limited to only the description of the firearm Lee possessed. All Fambrough's testimony showed was that Lee was at his home in 2013 and had a gun holstered on his hip that looked like a ".22 pistol" with a "target barrel" or "bull barrel" on it. This testimony had probative value because the forensic analyst testified that the victims and Taylor were shot with a .22-caliber gun and the actual murder weapon was never recovered. The "need for this type of evidence was greater" in this case based on circumstantial evidence "because it provided an additional set of facts from which the jury was authorized to infer [Lee's] guilt." *Harris*, 313 Ga. at 232 (3). And the danger of unfair prejudice did not substantially outweigh the probative value of Fambrough's testimony.

Fambrough's testimony about Lee's gun ownership was limited to his observation of Lee with a gun similar to the murder weapon. That was arguably inculpatory of Lee, but while "inculpatory evidence is inherently prejudicial in a criminal case, Rule 403 does not bar admission of such evidence merely because the defendant might suffer some amount of prejudice upon its introduction; it is only when *unfair* prejudice substantially outweighs probative value that the rule permits exclusion." Id. at 232 (3) (cleaned up) (emphasis in original). Fambrough did not offer any details about the circumstances of their interaction, which might have unfairly cast Lee in a negative light.

5. Lee contends that the assistant district attorney should have been disqualified because of his previous representation of Lee "in several different criminal cases" in which he "acquired information and knowledge," presenting a conflict of interest. We review the trial court's ruling on a motion to disqualify a prosecutor for an abuse of discretion. *Neuman v. State*, 311 Ga. 83, 88 (3) (856 SE2d 289) (2021). In support of this claim, Lee cites only his motion to

disqualify and the trial court's one-line order denying the same—he points to no evidence in the record showing that the assistant district attorney actually represented him in prior cases, let alone evidence of the "information and knowledge" that the assistant district attorney might have acquired during that alleged representation that could have disadvantaged Lee. It is Lee's burden to show what evidence supports this claim on appeal, and having failed to do so, his claim fails. *Hornbuckle v. State*, 300 Ga. 750, 753 (2) (797 SE2d 113) (2017) ("The appellant bears the burden of proving error by the appellate record." (citation and punctuation omitted)).

6. Lee contends that his trial counsel provided ineffective assistance in violation of the Sixth Amendment to the United States Constitution.

To establish ineffective assistance of counsel, a defendant must show both that his counsel's performance was professionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). "To prove deficiency, he must show that his lawyer

'performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms,' which is 'no easy showing, as the law recognizes a strong presumption that counsel performed reasonably.'" *Scott v. State*, 317 Ga. 218, 221 (2) (892 SE2d 744) (2023) (citation and punctuation omitted). To show prejudice, he must show "that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." Id. at 221-222 (2) (citation and punctuation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694 (III) (B).

Lee raises seven separate arguments that trial counsel provided constitutionally ineffective assistance. Briefly, he claims that counsel failed to (1) review "exculpatory" cell phone records; (2) review evidence about Chris; (3) review evidence about Taylor's shooting and as a result failed to effectively cross-examine Brittany O'Neal and Taylor; (4) effectively cross-examine the State's witnesses about the lack of physical evidence and timeline of the

21

murders; (5) object to the admission of text messages based on GBI Agent Chad Lott's testimony; (6) renew his motion for change of venue; and (7) provide Lee with all the discovery before trial. We review each argument in turn.

(a) Lee contends that his trial counsel's review of certain cell phone records was ineffective assistance. Lee points to counsel's failure to (1) introduce text messages between Chris and Bowen, allegedly showing Chris's rage toward Bowen in the hours before the murders; (2) notice that the Uniform Forensics Extraction Device ("UFED") report—which showed data extracted from the victims' cell phones—was missing for Bowen's primary cell phone and, if present, would have shown that Taylor lied about Lee shooting him in the ankle; and (3) introduce a text message from Bowen to Scott Harkleroad which would allegedly show Bowen knew nothing about Lee shooting Taylor. The cell phone records underpinning this ineffectiveness claim are not in the record on appeal: at the motion for new trial hearing, appellate counsel attempted to introduce a trial "demonstrative aid" incorporating the text messages, but the trial

22

court ruled against its admission because it was not authenticated, and Agent Lott testified that the UFED report was inaccessible because either a passcode was unavailable or the phone was damaged.

The unavailability of the records is fatal to these ineffectiveness claims. Lee argues that counsel was deficient for failing to introduce various text messages between Bowen and Chris, Taylor, and Harkleroad, respectively, but he offers no evidence to support his claim other than his own speculation that these texts exist and that they would have been exculpatory. Such speculation is not enough to establish deficient performance. See *Payne v. State*, 314 Ga. 322, 334 (3) (g) (877 SE2d 202) (2022) (holding counsel was not deficient where appellant "offer[ed] no evidence in support of this claim other than suggesting that additional investigation could have led to exculpatory evidence"). See also *Gittens v. State*, 307 Ga. 841, 844 (2) (a) (838 SE2d 888) (2020) ("Unfounded speculation about what additional investigation might have uncovered or about what unnamed witnesses may have testified [to] cannot support a claim that trial counsel was professionally deficient, nor can it establish

prejudice."). Because it is Lee's burden to show ineffective assistance in the record, this claim fails. See *Smith v. State*, 307 Ga. 106, 117-118 (6) (834 SE2d 750) (2019) (concluding ineffective assistance claim failed because the appellants' argument was speculative because they failed to identify any evidence in the record to support the claim) (citing *Norton v. State*, 293 Ga. 332, 339 (7) (d) (745 SE2d 630) (2013) ("[S]peculation that error may have occurred is insufficient to show any deficiency on the part of counsel, or prejudice therefrom, and is insufficient to show reversible error." (alterations accepted) (citation omitted))).

(b) Lee next contends his trial counsel was ineffective in failing to review and present certain evidence about Chris.

At the motion for new trial hearing, Lee introduced (1) a GBI investigative report detailing an interview with Chris after Bowen's death; (2) reports of incidents of domestic violence between Bowen and Chris; and (3) evidence of Chris's violence toward another woman, Cheryl McCollum, months after the murders. At the hearing, Lee did not ask trial counsel why he did not present evidence to

24

suggest Chris was an alternate suspect, call Chris as a witness, or introduce any of the reports of domestic violence into evidence. Instead, appellate counsel asserted only that the evidence related to Chris created "an insane amount of reasonable doubt," and trial counsel responded that he "didn't see an insane amount of reasonable doubt."

(i) Lee fails to show prejudice from any alleged deficiency from counsel's failure to review and introduce the GBI interview report and the incident reports of domestic violence between Chris and Bowen. Lee identifies no portion of the GBI report of Chris's interview or the domestic violence incident reports between Chris and Bowen that would have been "exculpatory." The report reflects that Chris was "extremely agitated and upset" when he was interviewed on the night of the murders because he did not know why he was at the Sheriff's Department. The report otherwise narrates a dispute between Chris and Bowen and Chris's recollection of Bowen telling him that Lee had abused her on several occasions, most of which was introduced into evidence through other witnesses. Given that,

25

and the fact that Chris had an alibi for the night of the shooting, Lee has not established that introducing the GBI report would have created a reasonable probability of an acquittal. *Stepp-McCommons v. State*, 309 Ga. 400, 409 (4) (b) (845 SE2d 643) (2020) (holding appellant's ineffective assistance claim failed because he failed to show that the content of an interview contained exculpatory evidence raising a reasonable probability that, but for trial counsel's failure to introduce it at trial, the results of the trial would have been different).

The same is true of the incident reports of domestic violence between Chris and Bowen. Several of the reports were from months or even years before the murders. Moreover, the reports were cumulative of other evidence presented at trial, including the testimony of Bowen's father and friend who recalled Chris and Bowen's abusive relationship, which trial counsel highlighted in his closing argument. Lee has not shown that either the GBI report or the domestic violence incident reports "contained exculpatory evidence raising a reasonable probability that, but for trial counsel's failure to

26

[introduce the reports at trial], the results of the trial would have been different." *Stepp-McCommons*, 309 Ga. at 409 (4) (b).

(ii) Lee has also failed to show trial counsel was deficient in failing to review evidence about Chris's threats toward McCollum. Lee contends that if counsel had properly reviewed the evidence, he would have introduced a police report from a July 6, 2016 incident between Chris and McCollum in which Chris got angry with McCollum, grabbed her, pushed her down, choked her, and then pointed a gun at her and said he "would kill her like he did the last b***h."

Lee has not established that trial counsel acted unreasonably by not introducing that report. To begin with, counsel was not asked at the motion for new trial hearing why he did not call Chris as a witness or about his reasoning in developing alternate suspects. Not securing trial counsel's testimony on these points makes it "particularly difficult" for Lee to overcome the strong presumption that trial counsel's actions were part of a deliberate trial strategy. *Jones v. State*, 296 Ga. 561, 567 (4) (769 SE2d 307) (2015).

27

In any event, the record offers a plausible strategic basis for not introducing this report in support of a theory that Chris committed the murders. At trial, counsel developed the theory that *Taylor* committed the murders. Counsel got Taylor to admit that he had lied to police and hospital staff about who shot him. In his closing, trial counsel argued that Taylor "lied to police and lied about what happened" and "lied through the whole thing." And other evidence tended to make Taylor more attractive than Chris as an alternate suspect. Gillespie testified that Taylor called her on the night of the murders and whispered to her on the phone that "somebody" shot up Lee's house, which counsel emphasized in his closing argument. Finally, Gillespie provided an alibi for Chris, testifying that she was with Chris on the night of the murders until 1:00 a.m.—well after 9:30 p.m., which time trial counsel argued was the likely time of death based on the evidence that the victims' phones stopped showing activity around that time. Given this evidence, a reasonable attorney could have opted to advance Taylor as an alternate suspect rather than Chris, and he could have decided that introducing

evidence that tended to inculpate Chris could muddle or weaken that defense. See *Sullivan v. State*, 308 Ga. 508, 511 (2) (a) (842 SE2d 5) (2020) ("A decision as to which defense witnesses to call is a matter of counsel's trial strategy and tactics and will not support a claim of ineffective assistance of counsel unless it is so unreasonable that no competent attorney would have made the decision under the circumstances." (cleaned up)); *Brooks v. State*, 309 Ga. 630, 637 (2) (847 SE2d 555) (2020) ("An attorney's decision about which defense to present is a question of trial strategy, and trial strategy, if reasonable, does not constitute ineffective assistance of counsel." (citation and punctuation omitted)). In short, Lee has failed to establish that not introducing this report was so unreasonable that no competent attorney would have made such a decision under the circumstances. See *Scott*, 317 Ga. at 223 (2) (a).

(c) Lee contends his trial counsel provided ineffective assistance by failing to review evidence about Taylor's shooting and, as a result, failing to impeach Brittany O'Neal or effectively cross-examine Taylor.

(i) At trial, O'Neal testified that Bowen revealed to her that Lee was abusive toward Bowen on several occasions. Bowen sent O'Neal photos of her bruises and cuts and called O'Neal after some of the incidents, including the axe incident described in Division 1 (a). O'Neal also testified that the day after Lee shot Taylor, Bowen called her and told her that Taylor "was over at [Bowen's] house and [Lee] rode by or something and he went crazy and shot—there was [sic] multiple gunshots fired and he had shot [Taylor] in the foot." O'Neal's trial testimony ran contrary to her interview with the GBI shortly after the murders, during which she explained that she was "not familiar with an incident involving Joey Taylor and Wallace Lee at Bowen's residence." Lee tendered a report of O'Neal's GBI interview at the motion for new trial hearing, and O'Neal testified that she did not recall initially denying knowledge of the incident but that she ultimately remembered Bowen sharing this with her because "after the initial shock of . . . Lee murdering [her] friend, [she] did have some time to think and recollect [her] memories." Lee contends that counsel should have impeached O'Neal with her prior

inconsistent statement. In Lee's view, O'Neal's testimony was the only evidence corroborating Taylor's statement that Lee shot him, so impeaching O'Neal would have made it much less likely that the jury would believe that shooting happened.

But even if counsel's failure to impeach O'Neal was deficient, Lee fails to show that impeaching her "would have made any difference to the outcome of [his] trial." *Clark v. State*, 307 Ga. 537, 542 (2) (a) (837 SE2d 265) (2019). To begin with, it is not clear introducing the report to impeach O'Neal would have been effective: O'Neal explained at the motion for new trial hearing that "after the initial shock of . . . Lee murdering [her] friend, [she] did have some time to think and recollect [her] memories." In any event, O'Neal was not the only witness who testified that Taylor shot Lee: another witness testified that Lee told him that Taylor was shot in the "crossfire" between Lee and Bowen, Gillespie testified that Taylor told her that Lee shot him, and of course, Taylor himself told the jury that Lee shot him. Given that cumulative evidence, especially Taylor's testimony—likely more compelling than Bowen's hearsay—it is not

likely that impeaching O'Neal would have changed the jury's mind about whether Lee shot Taylor. See id. (holding that there was no reasonable probability that any additional impeachment of a witness "would have made any difference to the outcome" of the defendant's trial because trial counsel had impeached the witness in other ways and another witness testified similarly about the incident) (citing *McCoy v. State*, 303 Ga. 141, 143 (2) (810 SE2d 487) (2018) (concluding appellant failed to show prejudice because "even if trial counsel had engaged in additional impeachment . . . there were still two other eyewitnesses who knew [appellant], identified him as the shooter, and gave similar descriptions of how he shot the victim")). So Lee has failed to establish prejudice.

(ii) Lee also contends that his counsel provided ineffective assistance by failing to "effectively" cross-examine Taylor about the day he was shot, his testimony that he "told everybody" Lee shot him, and his identification of Lee's gun. On cross-examination, trial counsel asked Taylor about the day Taylor said he was shot by Lee. Taylor stated that it was around dusk when Lee showed up and

32

started shooting and that Taylor was "running in circles," "jumping up and down," and "freaking out." Taylor also testified that he "lied to the police officer" at the hospital about who shot him because Bowen asked him to and only "corrected this lie" after learning about the murders two weeks later.

Lee has not shown that trial counsel's cross-examination of Taylor was constitutionally deficient. "The scope of cross-examination is grounded in trial tactics and strategy, and will rarely constitute ineffective assistance of counsel." *Priester v. State*, 317 Ga. 477, 490 (5) (c) (893 SE2d 751) (2023) (citation and punctuation omitted). Here, counsel cross-examined Taylor about the day he says Lee shot him and the circumstances of that encounter, and counsel elicited that Taylor lied to the police. Counsel then used that evidence in his closing argument, highlighting Taylor's testimony that he was "running in circles" and "jumping up and down" to cast doubt on Taylor's ability to accurately identify the type of gun Lee could have used, particularly considering the firearms expert's testimony that it would be difficult to identify this type of gun at night or at dusk,

when the shooting occurred. See *Washington v. State*, 312 Ga. 495, 503 (3) (b) (863 SE2d 109) (2021) ("[D]eficiency cannot be demonstrated by merely arguing that there is another, or even a better, way for counsel to have performed." (citation and punctuation omitted)); *Brown v. State*, 303 Ga. 617, 621 (2) (b) (814 SE2d 364) (2018) (holding that trial counsel was not deficient in failing to cross-examine a witness about an issue when counsel did ask about that issue on cross-examination and the appellant made no argument about how the issue could have been better presented). This cross-examination and counsel's use of it as part of Lee's defense was not "so unreasonable that no competent attorney would have made them under similar circumstances," *Bonner v. State*, 314 Ga. 472, 476 (2) (877 SE2d 588) (2022) (citation and punctuation omitted), so Lee has failed to show that counsel's performance was deficient, and his ineffectiveness claim on this ground fails.

(d) Lee argues broadly that his trial counsel provided ineffective assistance by failing to "effectively" cross-examine the State's witnesses about (i) the lack of physical evidence tying Lee to the

crime scene, (ii) certain "deer cam" footage, and (iii) the State's timeline of the night of the murders.

(i) With respect to the failure to cross-examine witnesses sufficiently about the "lack of physical evidence," Lee highlights the lack of shell casings found in Bowen's yard, the lack of fingerprints recovered from the shell casings that were found at Lee's home, tire tracks and footprints at the crime scene that did not match Lee or his truck, and the lack of gunpowder residue or blood spatter on Lee. But trial counsel's choices about using this evidence were not unreasonable. After investigators testified about the lack of shell casings found in Bowen's yard and the lack of fingerprints on those found at the crime scene, counsel asked about this on cross-examination and brought it up in his closing argument. The jury heard by stipulation that the footprints and tire tracks from the crime scene did not match Lee or his truck. And a forensic pathologist testified that no gunpowder residue or blood or other DNA evidence was found on Lee, and counsel emphasized that testimony in his closing. Not cross-examining the State witnesses further about these various

35

points rather than emphasizing it in closing is just the kind of strategic decision that will not be considered deficient unless no competent attorney would have made it under the circumstances, and Lee has failed to make that showing here. See *Bonner*, 314 Ga. at 476 (2) (appellant failed to show deficient performance where he "failed to demonstrate how cross-examination of these witnesses would have been helpful to him").

(ii) As to the deer camera footage, trial counsel testified at the motion for new trial hearing that he recalled watching it but "did not see anything significant" or "useful," on it. Appellate counsel attempted to introduce this footage with audio into evidence at the motion for new trial hearing, but the trial court ruled that it was not admissible because the authenticity of the audio was disputed. Without this footage in the record, Lee cannot establish how cross-examination about it could have helped his defense and therefore has not established that counsel's performance was deficient. See *Smith*, 307 Ga. at 117-118 (6) (appellant's burden to show error by the record); *Bonner*, 314 Ga. at 476 (2); *Brown*, 303 Ga. at 621 (2)

(b).

(iii) Lee contends that trial counsel was deficient in failing to effectively cross-examine two sets of witnesses about the timeline of the night of the murders: the bonfire witnesses who saw Lee driving down the street, and a deputy who responded to a semi-truck that was stuck in a ditch on Lee's street and, later, to Lee's 911 call about the gunshots at his house.

Lee has not shown how counsel's cross-examination of either set of witnesses was so unreasonable that no competent counsel would have made the same decisions.

Regarding the deputy, counsel elicited from the deputy that he did not remember seeing Lee driving on Lee's street close to where Bowen lived when the deputy responded to the semi-truck accident at around 11:45 p.m. or midnight the night of the murders. Counsel emphasized that testimony in closing, and contrasted it with the bonfire witnesses' testimony that Lee was seen driving on Lee's street at around 11:30 p.m. So the record belies Lee's argument that trial counsel "never connected the timeline" of the deputy's

testimony and the bonfire witnesses' testimony. Lee makes no further argument as to what counsel should have elicited on cross-examination of the deputy that would have been helpful to his defense, so he has not established that trial counsel's performance was deficient. See *Brown*, 303 Ga. at 621 (2) (b).

As for the bonfire witnesses, counsel cross-examined the witnesses about their ability to identify Lee and elicited that at least some of their identifications were uncertain. And as noted above, counsel highlighted this timeline in his closing argument, contrasting the bonfire witnesses' sighting of Lee at around 11:30 p.m. with the deputy's testimony that he did *not* see Lee on Bowen's road at around 11:45 p.m. or midnight. In the same part of his closing, counsel alluded to Agent Lott's testimony that the victim's cell phones showed no activity after 9:33 p.m. Counsel argued that the relevant timeframe for the murders was therefore around 9:30 p.m., not 11:30 p.m.

Given counsel's strategy of downplaying the bonfire witnesses' testimony—and the fact that Lee has not shown that any of the

38

bonfire witnesses would have testified any differently under further cross-examination—Lee has not established that counsel's cross-examination of those witnesses was constitutionally deficient. See *Priester*, 317 Ga. at 490 (5) (c) (appellant failed to show deficiency where he could not show that the witness "would have given a response helpful to" the appellant on cross-examination) (citing *Bonner*, 314 Ga. at 476 (2)). Thus, Lee fails to show counsel was deficient and his ineffectiveness claim on this ground fails.

(e) Lee contends that his trial counsel provided ineffective assistance by failing to object to the admission of Bowen's and Lee's text messages. He contends that an objection was warranted because the State's demonstrative aid lacked a foundation and because GBI Agent Lott was not qualified as an expert.

At trial, the State introduced Bowen's and Lee's phone records through the testimony of Agent Lott. Agent Lott testified to the GBI's method of extracting cell phone data using a software called Cellebrite and explained that he conducted the Cellebrite extraction of Lee's phone. Agent Lott also testified about Lee's and Bowen's cell

39

phone records, which were received from Verizon Wireless and identified discrepancies between the records and the extracted data showing that Lee had likely deleted the texts between himself and Bowen.

At the motion for new trial hearing, trial counsel was not asked why he did not object to the admission of the text messages through the Verizon records or the Cellebrite data. But the Verizon records underlying Agent Lott's testimony were authenticated by the custodian of the records. And regardless of whether the Cellebrite data was properly authenticated, Lee fails to show that the State could not have provided further foundation to support the admission of the text messages had trial counsel objected. See *Vivian v. State*, 312 Ga. 268, 273-274 (2) (a) (862 SE2d 138) (2021) (appellant's ineffectiveness claim failed where he did "not argue, much less demonstrate, that the State could not have provided additional foundational support for the admission of the cell phones if his counsel had objected"). See also id. at 273 (2) (a) ("[R]efraining from objecting to foundational matters that can be readily cured is not an

40

unreasonable strategy." (citation and punctuation omitted)).

Further, Lee has not overcome the presumption that counsel's decision not to object to Agent Lott's testimony was strategic. As summarized in Division 1 (b) above, Agent Lott testified at trial that Lee had sent Bowen threatening text messages, including on the day of the murders, and had called her from a hidden number. Agent Lott also testified that Lee texted Bowen asking where she was on the night of the murders at 10:18 p.m. and 10:21 p.m. and that the victims' phones stopped showing activity after around 9:30 p.m. In closing, trial counsel relied on Agent Lott's testimony that the phones stopped showing activity around 9:30 p.m. to argue that the relevant time frame for the murders was 9:30 p.m., not 11:30 p.m. Thus, choosing not to object was consistent with counsel's decision to highlight Agent Lott's testimony in support of his argument that the relevant time frame was 9:30 p.m. Accordingly, Lee has offered no evidence to overcome the presumption that trial counsel made a reasoned strategic decision not to object to this evidence. *Vivian*, 312 Ga. at 273 (2) (a) (counsel's decisions are presumed to be strategic if

41

not patently unreasonable and no evidence is presented to the contrary). So Lee fails to show deficiency and his ineffectiveness claim on this ground fails.

(f) Lee contends that his trial counsel provided ineffective assistance by failing to renew his motion for change of venue. Lee contends the jury selection process showed actual prejudice, rendering a fair trial impossible, because this was a "close-knit community," and nine potential jurors "were somehow connected to" Lee, Bowen, Harden, their families, or the assistant district attorney. Lee also contends that the fact that the jury returned a verdict within 30 minutes further supports his theory that the jury was "influenced by their personal relationships and the pre-trial publicity."

"To prevail on a motion to change venue, a defendant must show either that (1) the setting of the trial was inherently prejudicial or (2) the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible." *Mims v. State*, 304 Ga. 851, 858-859 (2) (c) (823 SE2d 325) (2019). Lee does not argue that the setting of the trial was inherently prejudicial. Instead, he

contends that the jury selection process showed actual prejudice because nine of the potential jurors knew Lee, Bowen, Harden, their families, or the district attorney. But the number of jurors who personally know or know of people involved in the case does not alone establish actual prejudice. See *Moss v. State*, 305 Ga. 878, 881 (2) (828 SE2d 309) (2019). Instead, the key question here is whether these jurors "could lay aside their opinions and render a verdict based on the evidence." Id. (citation and punctuation omitted). "Actual prejudice is thus shown by the excusal percentage — the number of potential jurors excluded for cause based on bias compared to the total number of potential jurors questioned." Id.

Here, the excusal percentage does not show actual prejudice. Of the 48 potential jurors, only four were excused for cause. So even including reasons aside from bias, the excusal rate in Lee's case was less than nine percent, well below what this Court has considered "actual prejudice." See, e.g., *Moss*, 305 Ga. at 881 (2) (excusal rate of 23 percent did not indicate actual prejudice in jury selection); *Chancey v. State*, 256 Ga. 415, 432 (5) (C) (349 SE2d 717) (1986)

43

(excusal rate of 40 percent did not indicate actual prejudice). More-over, none of the potential jurors who said that they had heard of the case or knew of people involved said they were unable to be impartial. See *Overstreet v. State*, 312 Ga. 565, 579 (3) (b) (ii) (864 SE2d 14) (2021) (holding appellant presented no evidence suggesting actual prejudice where "although each prospective juror had heard about the case in some way prior to jury selection, each of the jurors who were ultimately empaneled affirmed during voir dire that they could set aside what they had learned about the case outside the courtroom and render a verdict based solely on the evidence presented" and "[t]he only juror who expressed any sort of 'fixed bias' regarding the case was excused for cause"). Absent evidence of actual prejudice, a renewed motion for change of venue would have been meritless. Because counsel cannot be deficient for failing to file a meritless motion, see *Mims*, 304 Ga. at 858 (2) (c), Lee's ineffectiveness claim fails on this ground.

(g) Lee next contends that his trial counsel provided ineffective assistance by failing to provide Lee with all the discovery before

trial. Lee claims that before trial, counsel did not provide him (1) photos of the crime scene, (2) deer camera video with audio, (3) cell phone records, or (4) incident reports between Bowen and Chris and between Bowen and Lee.

At the motion for new trial hearing, trial counsel explained that he met with Lee before trial "[a]t least 10" times, "probably more than that." When asked whether he gave Lee all the discovery, trial counsel stated that he "gave [Lee] everything [he] had," including bringing a computer to play videotaped interviews for him at the jail. As for the phone records, trial counsel explained that because of the passage of time since trial, he only recalled that "[w]e went over a lot of records . . . . I don't know if specifically we went over [the Verizon records]." And trial counsel testified that he could not specifically recall whether he played the deer camera video for Lee and could not recall whether he ever received any deer camera audio from the State.

"[T]here is no per se rule requiring counsel for criminal defendants to provide them with copies of all discovery materials." *Shank*

45

*v. State*, 290 Ga. 844, 848 (5) (b) (725 SE2d 246) (2012). And Lee has not explained "why, in his case, a decision not to provide him with certain materials fell outside the bounds of reasonable professional conduct," so he has not shown that trial counsel's performance was deficient. Id. Thus, Lee's ineffectiveness claim on this ground fails.

(h) Finally, Lee contends that the cumulative prejudicial effect of trial counsel's errors entitles him to a new trial. We have assumed Lee's trial counsel performed deficiently by (1) failing to cross-examine and impeach O'Neal, and (2) failing to introduce the GBI report from Chris's interview and the domestic violence reports of incidents between Chris and Bowen. But these cumulative errors do not entitle Lee to a new trial unless "actual prejudice resulted." *Schofield v. Holsey*, 281 Ga. 809, 811 (II) & n.1 (642 SE2d 56) (2007), overruled on other grounds by *State v. Lane*, 308 Ga. 10, 23 (838 SE2d 808) (2020). And as discussed above, counsel's assumed failures are unlikely to have affected the outcome at trial. As to O'Neal, it is unlikely that any impeachment of her testimony about Lee shooting Taylor would have affected the outcome of trial, since several other

46

witnesses testified that Lee shot Taylor. And the failure to introduce the GBI interview report and the domestic violence reports had very little prejudicial effect, even considered together, because they each concern evidence that the jury still heard. For example, the jury heard about Bowen and Chris's abusive relationship and about Chris's whereabouts on the night of the murders through testimony from other witnesses. And plainly, the omission of Chris's denial of his violence toward Bowen and his recollection of Bowen telling him that Lee had abused her was not exculpatory and had no prejudicial effect. Given the relatively minor impact of counsel's assumed errors, Lee has not shown that the cumulative prejudice from those assumed errors likely affected the outcome of Lee's trial. This claim thus fails.

*Judgment affirmed. All the Justices concur.*

Decided February 6, 2024 — Reconsideration denied March 5, 2024.

Murder. Coffee Superior Court. Before Judge Spivey.

*Jody D. Peterman*, for appellant.

*Marilyn P. Bennett, District Attorney, John A. Rumker, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Clint C. Malcolm, Senior Assistant Attorneys General, Elizabeth H. Brock, Assistant Attorney General*, for appellee.