**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

## In the Supreme Court of Georgia

Decided: February 3, 2026

S25A1372.  SHELLS v. THE STATE.
S26A0138.  LESLIE v. THE STATE.

McMILLIAN, Justice.

Appellants Lewis Shells and Marcus Leslie were convicted of felony murder and other crimes related to two robberies, one of which resulted in the shooting death of Darius Tucker.[1]  On appeal,

---

[1] The crimes occurred on November 26, 2016.  In February 2017, a Troup County grand jury indicted Shells, Leslie, Jarvis Duncan, Lee Fair, and Gerald Florence individually and as parties to the crimes for felony murder predicated on home invasion (Count 1), home invasion (Count 2), criminal attempt to commit armed robbery against Tucker (Count 3), felony murder predicated on burglary in the first degree (Count 4), burglary in the first degree (Count 5), felony murder predicated on the aggravated assault of Tucker (Count 6), aggravated assault of Tucker (Count 7), aggravated assault of Zermezeon Heard (Count 8), aggravated assault of Adrian Tucker (Count 9), possession of a firearm during the commission of a felony (Count 10), armed robbery of David Rhodes (Count 11), armed robbery of Deanna Cameron (Count 12), burglary in the first degree (Count 13), aggravated assault of Rhodes (Count 14), aggravated assault of Cameron (Count 15), kidnapping of Rhodes (Count 16), kidnapping of Cameron (Count 17), false imprisonment of Rhodes (Count 18), false imprisonment of Cameron (Count 19), theft by taking from Rhodes (Count 20), theft by taking from Cameron (Count 21), and another count of possession

Shells argues that the evidence was insufficient to support his convictions. Leslie argues that the trial court violated his due process rights by conducting his arraignment without Leslie's presence or waiver; that the trial court abused its discretion by

of a firearm during the commission of a felony (Count 22). Each defendant was separately charged with possession of firearm by a convicted felon (Counts 23-27), but those counts were later nolle prossed. Duncan and Fair entered negotiated guilty pleas in which they agreed to testify truthfully concerning the matters. Shells, Leslie, and Florence were tried jointly from February 12 to 16, 2018, and a jury found them each guilty on all counts. The trial court sentenced Shells and Leslie to life in prison without the possibility of parole for the felony murder of Tucker predicated on home invasion (Count 1); a concurrent 20 years to serve for the aggravated assaults of Heard and Adrian Tucker (Counts 8 & 9); five years to serve consecutively for possession of a firearm during the commission of a felony (Count 10); a consecutive term of life imprisonment without parole for the armed robbery of Rhodes (Count 11); a concurrent term of life imprisonment without parole for the armed robbery of Cameron (Count 12); a concurrent 20 years to serve for burglary in the first degree (Count 13); two concurrent terms of life imprisonment without parole for kidnapping Rhodes and Cameron (Counts 16 & 17); two concurrent terms of ten years to serve for the false imprisonment of Rhodes and Cameron (Counts 18 & 19); two concurrent terms of five years to serve for theft by taking from Rhodes and Cameron (Count 20 & 21); and five years to serve consecutively for possession of a firearm during the commission of a felony (Count 22). The other counts were merged for sentencing purposes, although the felony murder convictions were actually vacated by operation of law. Florence is not a party to these appeals.

Shells and Leslie filed separate, timely motions for new trial, which were amended by new counsel. Following hearings, the trial court entered separate orders denying both motions for new trial, as amended. Both Appellants filed timely notices of appeal. Shells's case was docketed to the August 2025 term of this Court, Leslie's was docketed to the term beginning in December 2025, and both were submitted for a decision on the briefs.

allowing into evidence certain recorded jail calls of Leslie and certain surveillance videos and photographs; that the trial court abused its discretion by allowing two state investigator witnesses to remain in the courtroom throughout the trial in violation of the sequestration rule; that the trial court abused its discretion by allowing the State to present expert opinion through a lay witness; and that his trial counsel rendered constitutionally ineffective assistance in multiple ways. For the reasons discussed herein, we affirm both Shells's and Leslie's convictions.

The evidence presented at trial showed that Leslie, Lee Fair, Gerald Florence, and Jarvis Duncan concocted a plan to drive to LaGrange, where Fair's cousin Shells lived, so Shells could lead them to homes he selected where he knew the residents to possess large amounts of cash, making them good robbery targets.

According to Fair's testimony, he drove Leslie, Florence, and Duncan in his white Chevrolet Avalanche from Cobb County to LaGrange to meet Shells; their "plan was to come down here, hit one house, get some money, get some drugs. Hit another house, get some

3

money, get some drugs"; and "everybody" was "familiar with what the plan was." Fair testified that they met Shells, Shells provided them with a TEC-9 pistol at Granger Park, and Shells led them in his red Camaro to a house on Saynor Circle. The owner of the Saynor Circle house knew Shells, and Shells was aware that the owner had won about $3,000 playing poker a few days before because Shells had been there.

Shells drove away after leading the other men to the Saynor Circle house, but the other men stopped, got out of the Avalanche wearing masks and armed with firearms, and approached the house, where they encountered David Rhodes and Deanna Cameron, who were talking in the driveway. Fair testified that the men robbed the victims in the driveway at gunpoint; burglarized the house; bound the victims and forced them into the house; threatened to kill them; removed their clothing; loaded stolen goods into the victims' vehicles; and drove away with the vehicles as well. Rhodes and Cameron provided testimony at trial that corroborated Fair's account.

Fair testified that the men drove back to Granger Park, where they unloaded the items from the stolen vehicles into his Avalanche and then they met Shells a second time. Shells again led the other men to another house, this time on Edgewood Avenue, also in LaGrange, before leaving them there. Shells knew that Tucker and his brother lived at this house and knew that they were drug dealers with a reputation for carrying large amounts of cash.

Fair testified that the remaining men barged into the Edgewood Avenue house, and while they were trying to gain access to Tucker's room, as Tucker was inside, holding the door shut, a woman (who turned out to be Tucker's mother, Adrian) exited her room. There was a scuffle in which Tucker's mother was shot. The men then fled while shooting through Tucker's door. Tucker's mother and Heard (who was present with Tucker in his room during the incident) provided testimony at trial that corroborated Fair's account.

Tucker was struck twice by bullets and became unresponsive. His mother called 911, but despite EMS's resuscitative efforts,

Tucker was ultimately pronounced dead.[2]  Fair testified that he called Shells again as they fled the scene and told him that shots were fired; Shells said to "hit the highway and drive safe."  Duncan's trial testimony largely corroborated Fair's version of events.

In investigating the crimes, law enforcement collected and reviewed surveillance footage from police cameras and some local businesses in the areas around and between Saynor Circle, Edgewood Avenue, and Granger Park.  The footage, which was admitted into evidence at trial, showed the movements of the relevant vehicles in the area and around the time consistent with Duncan's and Fair's accounts of the co-indictees' movements on the night of the incidents.  Footage from the business where the four men met up with Shells showed a white Avalanche waiting for a red Camaro, one of the occupants of the Avalanche talking to someone in the Camaro, and the two vehicles leaving together.  Additional

_____

[2] The medical examiner who performed Tucker's autopsy testified "the one [shot] that enters the left side of the chest" was "[t]he most grievous one" because it "actually passes through the chest cavity, through the left sixth rib, through the left lung, pulmonary artery, the right ventricle of the heart, the right lung, and then exits out the right side of the chest."

6

footage from other surveillance cameras showed the Camaro in front of the Avalanche, travelling in the directions of the robbery locations, as well as parking together near the victims' stolen vehicles in the park. Footage from a police pole camera showed a white Avalanche near the interstate close to the time Shells's co-indictees would have been fleeing back home after the incidents, and a tag reader confirmed that Fair's Avalanche was on the interstate traveling toward the Atlanta area a few minutes later. Law enforcement also received information that someone had attempted to use Rhodes's credit card at an ATM at a RaceTrac in East Point shortly after the robberies. Surveillance footage from that location showed Florence getting out of the Avalanche, entering the store, and attempting to use a card at the ATM at the time Rhodes's credit card company indicated the card was used. Cell-phone records of the co-indictees' phones were also admitted into evidence at trial, and an analyst with the LaGrange Police Department testified that they showed multiple communications between the co-indictees' cell phones before, during, and after the crimes, and showed that

7

Shells's phone remained in LaGrange during that period, while the phones of his co-indictees travelled from the Atlanta area, to LaGrange, and then back during the same time.

Information about the Avalanche led to Fair's home, where Fair and Duncan were detained. There, law enforcement officers located several items connecting the men to the incidents, including Rhodes's wallet and distinctive ammunition matching that recovered from the scenes. In the Avalanche, officers located duct tape, a purse, and several ski-style masks. Fair and Duncan both provided statements, confessing to the crimes and implicating Florence and Leslie and the "set-up" they had with Shells. Florence and Leslie were subsequently arrested.

### Case No. S25A1372, Shells v. The State

1. On appeal, Shells argues in a single enumeration of error that the evidence was constitutionally insufficient to sustain his convictions. More specifically, Shells argues that because the State's primary evidence linking him to the crimes came from the testimony of co-indictees Fair and Duncan, the evidence was

insufficient because they were never asked and never testified whether Shells (in meeting with the other co-indictees, providing them with a firearm, and leading them to the two robbery locations) knew that the purpose of going to the two locations was to commit robberies.

Shells also argues that the evidence was insufficient to show that the alleged acts of the assailants actually caused the death of Tucker because when the medical examiner was asked if he was able to determine which gunshot wound to Tucker was fatal, he merely described "the one that enters the left side of the chest" as "[t]he most grievous one" because it "actually passes through the chest cavity, through the left sixth rib, through the left lung, pulmonary artery, the right ventricle of the heart, the right lung, and then exits out the right side of the chest," but the medical examiner never answered the ultimate question, and the State never asked further, for his expert opinion about whether either wound was fatal or caused Tucker's death. These arguments fail.

When this Court evaluates the constitutional sufficiency of the

9

evidence, "we view the evidence presented at trial in the light most favorable to the verdicts and consider whether it was sufficient to authorize a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crimes for which he was convicted." *Dougherty v. State*, 321 Ga. 577, 581 (2025) (citing *Jackson v. Virginia*, 443 US 307, 319 (1979)). "This limited review leaves to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." *Muse v. State*, 316 Ga. 639, 647 (2023) (citation and punctuation omitted). "Additionally, conviction as a party to a crime requires proof of a common criminal intent, which the jury may infer from the defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes." *Holloway v. State*, 320 Ga. 653, 655 (2025) (cleaned up); see also OCGA § 16-2-20 ("Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime."); *Scoggins v. State*, 317 Ga. 832, 836 (2023).

10

With these principles in mind, the evidence here showed that Shells's co-indictees planned to come to Troup County for the purpose of committing robberies; that they met with Shells (a local and Fair's cousin), who gave them a firearm and led them in his Camaro to two separate houses that the others then robbed; that Shells had knowledge that the resident of the first house had just won thousands of dollars in a poker game and that the residents of the second house were drug dealers who kept large amounts of cash; that Shells led his co-indictees to the second house after they had committed their crimes at the first house; and that Fair called Shells as they fled the second location to inform him that shots were fired, and Shells told them to "hit the highway and drive safe." Moreover, Fair testified that "everybody" was "familiar with what the plan was."

This evidence, when viewed in the light most favorable to the verdict, was constitutionally sufficient to authorize a rational jury to find beyond a reasonable doubt that Shells shared a common criminal intent with his co-indictees and was guilty at least as a

11

party to the crimes for which he was convicted. See, e.g., *Dougherty*, 321 Ga. at 581–82 (evidence showing, among other things, that defendant agreed to supply a firearm, assisted co-defendant in identifying house to lure victim to, and agreed to provide a vehicle and drive co-defendant was sufficient to support finding that defendant "agreed to a plan to rob [victim] and possessed the requisite intent" to support convictions for felony murder predicated on assault and robbery, "at a minimum, as a party to the crimes"); *Grant v. State*, 319 Ga. 490, 493 (2024) (evidence showing, among other things, that defendant had knowledge of victim's substantial gambling winnings and had communicated with co-defendant several times on the night of crimes both before and after the victim's robbery and murder, was sufficient for jury to reasonably infer that defendant shared a common criminal intent with his co-defendant).

As for Shell's argument that the evidence was insufficient to prove that the gunshots inflicted on Tucker during the assault upon him were the cause of his death, we recognize that "the cause of

death in a homicide case may always be shown by circumstantial evidence," *Sorrells v. State*, 267 Ga. 236, 238 (1996); see also *Shields v. State*, 285 Ga. 372, 374 (2009); whether the injuries inflicted by a defendant proximately caused a victim's death is a jury question, *Taylor v. State*, 303 Ga. 624, 627 (2018); *Robinson v. State*, 298 Ga. 455, 458 (2016); and in assessing on appeal whether the evidence of causation was sufficient, we view that evidence in the light most favorable to the verdict. *Sinkfield v. State*, 318 Ga. 531, 538 (2024). Here, the evidence was both direct and circumstantial. It showed that Tucker was shot twice by the assailants through his door, collapsed bleeding and unresponsive, and was carried away by medical personnel before being pronounced dead. In addition, the medical examiner testified that both gunshots were "grievous" and that the "most grievous" one was caused by a bullet that traveled through Tucker's chest and heart. Viewed in the light most favorable to the jury's verdict, this evidence was sufficient for the jury to find beyond a reasonable doubt that the gunshots inflicted by the assailants caused Tucker's death. See, e.g., id. at 538 (affirming

conviction where "the medical records and the testimony of the medical examiner, viewed in the light most favorable to the verdicts, were sufficient for a rational trier of fact to find beyond a reasonable doubt that the cause of death [ ] result[ed] from the injuries [the victim] sustained").

The evidence presented at trial and summarized above is therefore constitutionally sufficient to sustain Shells's convictions. Accordingly, his sole claim of error on appeal fails.

**Case No. S26A0138, Leslie v. The State**

2. Leslie contends that the trial court violated his due process rights under the Georgia Constitution by conducting critical court proceedings, specifically his arraignment, without his presence or waiver. This claim fails.

Prior to trial, Leslie was allowed by the trial court to raise a complaint that he had not been brought to court since his arrest. Specifically, Leslie explained:

> Your Honor, I've been locked up since March 21st, 2016 –
> I mean, '17. And I haven't been to a first appearance. I
> haven't been to any court proceedings. This is my first

14

time ever being in front of a judge since I've been arrested. I haven't had a judge officially read me my charges, telling me what I've been charged with or nothing, Your Honor.

In response, the court asked whether trial counsel had gone over the indictment and discovery with Leslie, which Leslie confirmed. The trial court then remarked, "So it's my understanding that you waived formal arraignment in this case. And it sounds like y'all have been over the discovery and the charges." After further colloquy between the trial court and Leslie's counsel, a break was taken. Court reconvened, and the discussion continued on the record with the trial court asking whether everybody had a chance to review the indictment. Leslie's trial counsel confirmed that Leslie had "joined issue on both the redacted and the original indictment and provided you with a copy" and that Leslie was ready to go to trial.[3]

In its subsequent order denying Leslie's motion for new trial, the trial court found that Leslie "waived the right [to] be present at

---

[3] The record shows that Leslie signed the indictment, pleading not guilty, on February 12, 2018, the day trial commenced.

arraignment because his attorney waived arraignment and the record shows evidence of his subsequent acquiescence" because Leslie "notified the Court that he had not been read his charges by a judge, but after clarifying questions and a conversation between the Defendant and trial counsel, the Defendant joined issue … . [and Leslie's] signature on the indictment shows his acquiescence to counsel's waiver."

Leslie argues on appeal that because he never waived his right to be present at his arraignment or gave his trial counsel consent to waive his presence, his right to be present at a critical stage of the proceeding has been violated such that he is entitled to a new trial. See *Brewner v. State*, 302 Ga. 6, 12 (2017). "[T]he right to be present is waived if the defendant personally waives it in court; if counsel waives it at the defendant's express direction; if counsel waives it in open court while the defendant is present; or if counsel waives it and the defendant subsequently acquiesces in the waiver." Id.

Here, even assuming that Leslie did not waive his presence at arraignment or give his counsel permission to waive his presence,

16

the record supports the trial court's finding that Leslie subsequently acquiesced in the waiver. After raising the issue with the trial court, Leslie was given additional time to discuss the issue with his attorney, who then confirmed in Leslie's presence that he had gone over the indictment with Leslie, that Leslie had "joined issue" on the indictment, and that Leslie was ready for trial. Sometime during that timeframe, Leslie also signed the indictment. Because Leslie was notified by the trial court that his counsel had waived formal arraignment for him, signed the indictment indicating that he was aware of the charges against him, and proceeded with trial without further objection, the record supports the trial court's finding that Leslie acquiesced to the waiver of his presence at arraignment. See *Champ v. State*, 310 Ga. 832, 841 (2021) ("Acquiescence may occur when a defendant remains silent after he becomes aware of the proceedings occurring in his absence, so long as he had sufficient information concerning the matters occurring outside his presence for his silence to be fairly construed as consent."). Because the trial court's factual findings on the issue in its order denying Leslie's

17

motion for new trial are supported by the record, this claim fails. See id. ("[T]he trial court's findings of fact on the issue will be upheld on appeal unless clearly erroneous.").

3. Leslie contends that the trial court abused its discretion by allowing into evidence recorded jail calls of Leslie that the State did not produce until after the beginning of trial, which Leslie contends on appeal was a bad-faith failure to comply with OCGA § 17-16-4(a)(1), which provides in pertinent part that "[t]he prosecuting attorney shall [ ] disclose to the defendant the substance of any [ ] relevant written or oral statement made by the defendant while in custody, whether or not in response to interrogation."

The record shows that after opening statements, during which Leslie's counsel called into question whether Leslie went by the nickname "Mod" (a nickname used by his co-defendants to identify one of the perpetrators), the trial court took a brief recess. Upon reconvening, the prosecutor announced that in response to trial counsel's opening statement, the State intended to present some jail calls in which Leslie was referred to as "Mod" and that the State

18

would provide copies of the jail calls to Leslie's counsel "tonight" after Leslie's counsel objected that he had not had the opportunity to review the calls. The first day of the presentation of evidence then resumed and later concluded.

At the beginning of the next day of trial, Leslie's counsel announced that he had an opportunity to listen to the recording and objected to its admission. Leslie's counsel argued that it would subvert the discovery process and be "unjust" to allow him to give an opening statement based on the discovery provided at that point and then allow the State to bring in new evidence based on counsel's opening statement. The State argued that the jail calls were not previously produced in discovery because they did not seem relevant until Leslie's counsel presented in opening statement that Leslie did not go by the name "Mod." The trial court opined, "[n]obody's arguing that this was done in bad faith. It doesn't appear to be done in bad faith; nobody's hiding the ball here. And so to exclude it would be a really extreme sanction. … So I'm going to overrule the objection. I'm going to allow it."

19

Leslie argues on appeal that the trial court abused its discretion in allowing the recording of the jail calls into evidence because the jail calls should have been produced sooner in discovery under OCGA § 17-16-4(a)(1) and that the State's lack of production of the jail calls was in bad faith, such that exclusion under OCGA § 17-16-6 was required.

> OCGA § 17-16-6 provides in relevant part:
>
> If at any time during the course of the proceedings it is brought to the attention of the court that the state has failed to comply with the requirements of this article, the court may order the state to permit the discovery or inspection, interview of the witness, grant a continuance, *or, upon a showing of prejudice and bad faith*, prohibit the state from introducing the evidence not disclosed or presenting the witness not disclosed, or may enter such other order as it deems just under the circumstances. (emphasis supplied).

Pretermitting whether the recording should have been produced in accordance with OCGA § 17-16-4(a)(1), the record supports the trial court's finding that the State did not act in bad faith in not producing the jail calls in discovery where Leslie's trial counsel did not argue that the State acted in bad faith and the State presented a reasoned

basis for why the jail calls were not produced earlier,[4] meaning exclusion was not required under the circumstances and the trial court therefore did not abuse its discretion. See *Jester v. State*, __ Ga. __, __ (2025) ("The exclusion of evidence is not required under OCGA § 17-16-6, and of the available remedies is a particularly harsh sanction that should be imposed only where there is a showing of bad faith by the party that has failed to comply with its discovery obligation and prejudice to the other party." (cleaned up)). Accordingly, this claim fails.

4. Leslie further contends that the trial court abused its discretion by allowing into evidence certain surveillance videos and photographs without requiring a proper foundation.

During the State's case in chief, the prosecutor called Detective Jason Duncan, who testified that he assisted on the investigation by looking for possible surveillance footage that could contain evidence related to the crimes. He testified that he observed the relevant

---

[4] We note that the calls were only used by the State at trial to show that Leslie went by "Mod" and that the record supports that the State had no prior notice that Leslie would argue he was not "Mod."

21

vehicles on surveillance video from Granger Park, as well as the white Avalanche on a police pole camera near the interstate, and that he later received information that the Avalanche was detected on the interstate going toward Atlanta a few minutes later by a tag reader. Detective Duncan explained that he then searched for more videos from other locations in the area and discovered that a business near Edgewood Avenue had a relevant video.

At that point, defense counsel objected on the grounds that someone from the business should be required to testify and authenticate the video. The State responded:

> [T]hese are stationary … surveillance cameras. … We don't have anyone from that store that's going to come in and say I was there, I saw that, I was holding that camera. And that's what this code section [OCGA § 24-9-923] contemplates in Subsection C. It allows for a law enforcement officer to go in, take his due diligence and time stamp those videos. And that's what Detective Duncan did in this case, and that's what he'll testify to.

After permitting the State to examine Detective Duncan to lay a foundation for several surveillance video recordings he had reviewed and obtained during his investigation, and the defense to cross-

22

examine him regarding the same, the trial court ruled:

> [T]he evidence that I heard shows that there is no person that's available to do this. There's just automated systems. The detective timed the systems, verified the accuracy of the systems. … So just sticking with the evidence that I heard, I'm going to allow it, as far as authenticity goes.

Leslie argues on appeal that because other persons, such as employees of the business where the video was obtained, could have laid the foundation to admit this evidence, and those persons were not "unavailable," as defined by OCGA § 24-9-923(a), the trial court abused its discretion in permitting Detective Duncan to lay the foundation instead. But the record, as discussed above, reflects that the trial court admitted this evidence under OCGA § 24-9-923(c), which does not require witness unavailability to apply.

OCGA § 24-9-923(c) provides:

> Subject to any other valid objection, photographs, motion pictures, video recordings, and audio recordings produced at a time when the device producing the items was not being operated by an individual person or was not under the personal control or in the presence of an individual operator shall be admissible in evidence when the court determines, based on competent evidence presented to the court, that such items tend to show reliably the fact

23

or facts for which the items are offered, provided that, prior to the admission of such evidence, the date and time of such photograph, motion picture, or video recording shall be contained on such evidence, and such date and time shall be shown to have been made contemporaneously with the events depicted in such photograph, motion picture, or video recording.

OCGA § 24-9-923(c) therefore provides that date-and-time-stamped video recordings and photographs taken by cameras such as the ones at issue here "shall be admissible" when the court determines their reliability, without any requirement of showing the unavailability of a witness to personally authenticate them.  See *Mitchell v. State*, 320 Ga. 673, 677 (2025) (noting that OCGA § 24-9-923(c) applies to "video recordings from autonomous cameras").  Moreover, as a general rule, authentication may be shown "by evidence sufficient to support a finding that the matter in question is what the proponent claims."  OCGA § 24-9-901(a).  As with other rulings concerning the admissibility of evidence, "[r]ulings that admit evidence over an objection to authentication are reviewed for an abuse of discretion." *Mitchell*, 320 Ga. at 676.

Here, competent evidence in the record supports the trial

24

court's findings that this surveillance image evidence came from "automated systems," that Detective Duncan "verified the accuracy of the systems," including the timestamps on the images produced, and that the evidence showed what the proponent claimed. Therefore, the trial court did not abuse its discretion in admitting the surveillance image evidence under OCGA § 24-9-923(c). See, e.g., *Mitchell*, 320 Ga. at 677. Accordingly, this enumeration of error fails.

5. Leslie contends that the trial court abused its discretion by allowing two state witnesses to remain in the courtroom throughout the trial in violation of the sequestration rule. This claim fails.

Before the start of trial, the State moved to have two testifying detectives, Detective Brian Brown and Detective Jeremy Jones, remain at the prosecution table throughout the course of the trial because Detective Brown was the lead investigator of the Saynor Circle incident and Detective Jones was the lead investigator of the Edgewood Avenue incident, and "[t]here is a lot of evidence at each scene, and there's a lot of witnesses for each scene. And the State

25

believes that it's necessary for the orderly presentation of evidence to have them both at the table with us." The trial court overruled defense counsel's objection.

OCGA § 24-6-615, commonly referred to as the rule of sequestration, provides for the exclusion, upon request or upon the court's own motion, of most witnesses "so that each witness cannot hear the testimony of other witnesses," but "[t]his Code section shall not authorize the exclusion of: … [a] person whose presence is shown by a party to be essential to the presentation of the party's cause." "The trial judge is vested with broad discretionary powers in administering the rule of sequestration, which will not be controlled unless manifestly abused." *Williams v. State*, 277 Ga. 853, 857 (2004). Here, we see no manifest abuse of the trial court's broad discretion in administering the rule of sequestration by permitting the lead detectives over each crime scene to remain at the prosecution table for the duration of the trial where the State explained why each detective was necessary for the orderly presentation of the case. See, e.g., *Holloman v. State*, 291 Ga. 338,

340 (2012) (recognizing principle that "when the prosecutor indicates that a witness is needed in the courtroom for the orderly presentation of evidence, there is no abuse of discretion in permitting the witness to remain" (citation omitted)); *Miller v. State*, 359 Ga. App. 380, 388–89 (2021) (holding trial court did not abuse its discretion in exempting multiple witnesses from rule of sequestration). Accordingly, this enumeration of error fails.

6. Leslie contends that the trial court abused its discretion by allowing the State to present expert opinion regarding the location of the defendants' cell phones through a lay witness, Analyst Andrew Foy with the LaGrange Police Department. While pretrial matters were being discussed, the defense orally moved to exclude Foy's testimony because he did not have the expertise to opine on "cell phone geoanalytics" and even if he did, the State failed to produce the data and analysis supporting his opinion 10 days before trial as required by OCGA § 17-16-4(a)(4). After hearing additional argument, the trial court denied the motion but stated that counsel could renew the objection based on Foy's testimony at trial.

Before Foy testified on the fourth day of trial, the defense stated that it would like to renew its objection and that it never got to voir dire the witness, and the trial court responded:

> [I]f that's what you want to do. I will say this … There's no science based on the records that I was given that would be required here, based on what I saw. Everything is laid out. This is just an organizational thing. And so, whatever science there is to the way that waves bounce off of the different whatever, pole they received on around the counties. Whatever science there is to that has long been accepted. There's no – not even an objection related to the science of it. … I just don't see – I mean, this to me seems like something that we've evolved into that's no different than reading a Google map or anything else. And so, it doesn't seem scientific to me anymore. … And the records in particular, this is not like you just got some sort of peculiar, long list of numbers and letters from the carrier. The records themselves that are [] already in evidence … lay out[] [o]n this date and time. At this address, this directional side of the tower, I'm not so sure that the juror could figure that out, much less. So that's at least my take on where we are with that. Now, out of an abundance of caution, if you need – if we want to ask him some questions ….

At that point, the prosecutor suggested that the court bring Foy in so defense counsel could voir dire the witness, but the defense attorneys declined to ask any questions.

Foy was then called to testify. He was not tendered as an

expert, and he testified from the cell phone records already admitted in evidence, as well as his own reports, which were tendered and admitted during his testimony, about the location of the defendants' cell phones during the timeframe of the crimes. Foy began by explaining that he was an "analyst" with the LaGrange Police Department, whose general duties were to "control all the intake of intelligence …. [a]nalyze it properly, store it properly and then disseminate it throughout the police department," and also to "focus on all of our cell phones, computer technology, and the extraction and proper analyzing that information." Foy went on to explain what the various columns on certain previously-admitted cell phone records meant, including the columns providing information on which cell tower locations the calls were placed from, from which one could plot on a map the location of the cell phones making the calls – a process that Foy explained he did by hand in the past, but that he now uses a software program "to do it for me" to "automatically" produce a mapping report. When those reports were tendered, and the trial court asked, "Any objection[?]" each defendant responded,

29

"No objection." Foy went on to explain how the records and reports showed multiple communications between the co-indictees' cell phones before, during, and after the crimes, and showed that Shells's phone remained in LaGrange during that period, while the phones of his co-indictees traveled from the Atlanta area, to LaGrange, and then back during the same time frame.

Leslie argues on appeal that the trial court abused its discretion by allowing Foy to testify as a lay witness about where a particular phone was located because that would require opinions or inferences "based on scientific, technical, or other specialized knowledge." OCGA § 24-7-701. As a result, Leslie argues, the State was able to improperly "backdoor" expert opinion into evidence without complying with the statutory requirement that the reports and data he testified from be provided to the defense no later than ten days prior to trial under OCGA § 17-16-4(a)(4).

Assuming the defense's renewed objection before Foy's testimony preserved this issued for ordinary appellate review – despite the defense's decision to not voir dire Foy or further object to

his testimony or reports at the time they were admitted into evidence – Leslie's claim still fails.  As found by the trial court, Foy was not opining on the science supporting how to locate cell phones but instead had plotted the locations of the cell phones on maps based on cell phone records that had been previously admitted into evidence. According to the trial court, this was "no different than reading a Google map."  We conclude that under the circumstances of this case, the trial court did not abuse its discretion in concluding that Foy's testimony and mapping reports were not based on scientific, technical, or other specialized knowledge within the meaning of OCGA §§ 24-7-701 and 702. See *Bullard v. State*, 307 Ga. 482, 492 (2019) ("'[L]ay witnesses may draw on their professional experiences to guide their opinions without necessarily being treated as expert witnesses.'" (quoting *United States v. Jeri*, 869 F3d 1247, 1265 (11th Cir. 2017)); *Moody v. State*, 316 Ga. 490, 531 (2023) (holding that nurse's testimony that based on her experience defendant did not appear to be mentally deficient was admissible as lay evidence under Rule 701); *Pritchett v. State*, 314

31

Ga. 767, 781–84 (2022) (holding that investigator's testimony that hole he observed was consistent with .40-caliber projectile and that blood drops indicated certain information about how the crime was committed was admissible as lay evidence under Rule 701 based on investigator's prior professional experience); see also *Nundra v. State*, 316 Ga. 1, 14–16 (2023) (holding that trial court's admission of expert testimony about DNA evidence using statistical software for DNA analysis, without requiring expert testimony on a random-bystander benchmark, was not clear or obvious error under the plain error standard of review where there was no precedent suggesting that expert testimony about a random-bystander benchmark was necessary for a trial court to admit DNA evidence using the software). Accordingly, this claim fails.

7. Leslie also contends that his trial counsel rendered constitutionally ineffective assistance in multiple ways: (a) by proceeding to trial when certain exculpatory evidence had not been tested or returned by the crime lab yet; (b) by refusing Leslie's request to file a motion to sever despite there being an antagonistic

defense and a likelihood of confusion of the evidence; (c) by causing Leslie's absence at several necessary and important stages of the criminal proceedings; (d) by failing to investigate the connection of someone named "Marcus Patton" with this case; and (e) by failing to investigate Leslie's alibi defense.

To succeed on a claim of ineffective assistance of counsel, Leslie must show both that his counsel's performance was deficient and that such deficiency prejudiced his defense. See *Strickland v. Washington*, 466 US 668, 687 (1984). To satisfy the deficiency prong, Leslie must demonstrate that his counsel "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Bacon v. State*, 316 Ga. 234, 239 (2023) (citation and punctuation omitted). To establish prejudice, Leslie "must prove that there is a reasonable probability that, but for his trial counsel's deficiency, the result of the trial would have been different." *Bates v. State*, 313 Ga. 57, 62 (2022). And if Leslie fails to make a sufficient showing on either the deficiency or the prejudice prong, we need not address the

other prong.  See *Washington v. State*, 313 Ga. 771, 773 (2022).

(a)    *Proceeding to trial before return of crime-lab evidence*. Leslie argues that the record shows that there was a large amount of evidence collected from the crime scenes that was still being processed and was not yet returned at the time of trial, yet trial counsel proceeded without it, even though Leslie's main defense was that he was not present during the commission of the crimes but was instead with his girlfriend, meaning any evidence that came back would have been exculpatory and could have exonerated Leslie.  And Leslie further asserts, without supporting authority, that because counsel's failure means we do not know whether that evidence would have been exculpatory or inculpatory, the Court should presume harm.

But "[u]nfounded speculation about what additional investigation might have uncovered or about what unnamed witnesses may have testified to cannot support a claim that trial counsel was professionally deficient, nor can it establish prejudice." *Payne v. State*, 314 Ga. 322, 334 (2022) (quoting *Gittens v. State*, 307

34

Ga. 841, 844 (2020)). Because Leslie merely speculates that this allegedly missing evidence would have been exculpatory, without making any proffer in support of that claim, he has failed to meet his burden of demonstrating either deficiency or prejudice and has thus failed to establish ineffective assistance of counsel. See, e.g., *Lee v. State*, 318 Ga. 412, 421 (2024); *Payne*, 314 Ga. at 334.

(b) *Refusing to file motion to sever.* Leslie argues that counsel rendered ineffective assistance by refusing to file a motion to sever and that the motion would have been granted because Leslie was the only defendant with an alibi and was not arrested until months after the crimes, such that there was a likelihood of confusion of the evidence and law, a possibility that evidence against other defendants may be considered against Leslie, and an antagonistic defense between Leslie and his co-defendants.

"Whether to seek severance is a matter of trial strategy, and in the absence of evidence to the contrary, counsel's decisions are presumed to be strategic and thus insufficient to support an ineffective assistance of counsel claim." *Green v. State*, 302 Ga. 816,

35

819 (2018) (citation omitted). In determining whether a severance should be granted, the trial court must consider "whether a joint trial will create confusion of evidence and law; whether there is a danger that evidence implicating one defendant will be considered against a co-defendant despite limiting instructions; and whether the defendants are asserting antagonistic defenses." *Smith v. State*, 307 Ga. 106, 119 (2019).

Leslie "was being tried under the theory that he was a party to the crime and there was ample evidence to show that he was a party to the crime. Where, as here, there is sufficient evidence of a common scheme or plan to commit a criminal offense, joinder is authorized and severance is not mandatory." *Green*, 302 Ga. at 819 (cleaned up); see also *Butler v. State*, 290 Ga. 412, 413 (2012). In addition to the co-defendants being charged and tried as parties to the crimes, meaning the evidence presented applied equally to all of them, we note further that Leslie points to no evidence that would have been excluded had his case been severed and he were tried alone. Also, all three co-defendants presented alibi defenses, none of

which were antagonistic to one another, such that there was no real danger of confusion of the evidence and law or of evidence against other co-defendants being improperly considered against Leslie. See, e.g., *Green*, 302 Ga. at 819; *Lupoe v. State*, 300 Ga. 233, 242 (2016); *Butler*, 290 Ga. at 413. Given the foregoing, Leslie has not shown that a motion to sever would have succeeded, and thus he has failed to carry his burden of establishing deficiency by overcoming the presumption that his trial counsel's presumed strategic decision to not file a motion to sever was objectively unreasonable. See *Smith*, 307 Ga. at 120 ("Because [defendant's] trial lawyer reasonably could believe that the motion for severance would not be granted, [defendant] has failed to show ineffective assistance of counsel."); *Lupoe*, 300 Ga. at 242 (defendant failed to carry burden of establishing deficient performance where trial counsel was not questioned about his reason for failing to seek severance of his defendant's trial from his co-defendants and record showed motion would have failed). Accordingly, this ineffective assistance claim fails.

(c)     *Causing Leslie's absence at critical stages.*  Leslie contends that trial counsel's actions, as discussed in Leslie's first enumeration of error, show that his counsel rendered ineffective assistance in causing Leslie's absence during his arraignment.  But, as we have already concluded in Division (2), Leslie was notified of his counsel's waiver of Leslie's right to be present at arraignment, signed the indictment acknowledging the charges against him, and acquiesced to counsel's waiver, meaning that even assuming that counsel was deficient in failing to ensure Leslie's presence at arraignment, Leslie cannot show that the failure prejudiced him. See *Keller v. State*, 308 Ga. 492, 496 (2020) ("While a meritorious claim of structural error does not require a showing of prejudice, this Court has declined to presume prejudice in the context of an ineffective assistance of counsel claim based on attorney performance."); *Biggs v. State*, 281 Ga. 627, 632 (2007) ("Waiver of arraignment provides a basis for a claim of ineffective assistance of counsel only if the defendant can show he was unaware of the charges against him."); *McCulley v. State*, 275 Ga. 473, 475–76

(2002) (concluding that defendant could not prevail on an ineffective assistance claim based on counsel's decision to abandon a possible defense when that decision was made after consultation with the defendant, who acquiesced in that decision). This ineffectiveness claim therefore fails.

(d) *Failing to investigate Marcus Patton.* Leslie points to certain evidence showing that his phone number was not saved in Fair's phone and that Fair did have a phone number saved as "Mod" that belonged to another individual named Marcus Patton. **«See V4 80»** Leslie argues that no reasonable attorney could conclude that the investigation of Marcus Patton would not be important but that Leslie's trial counsel did not investigate it, constituting ineffective assistance.

Again, Leslie merely speculates that had counsel investigated Marcus Patton, then evidence showing that Patton actually committed these crimes would have been discovered. Accordingly, Leslie has failed to meet his burden of demonstrating prejudice and has thus failed to establish ineffective assistance of counsel. See,

e.g., *Lee*, 318 Ga. at 421; *Payne*, 314 Ga. at 334.

(e)     *Failing to investigate alibi.* Leslie also argues that his trial counsel did not fully investigate, develop, or present Leslie's alibi defense that he was with his girlfriend at the time of the incidents. Leslie complains that his trial counsel called only Leslie's mother and girlfriend to testify about his alibi, when counsel could also have called other witnesses, like Leslie's sister who was in the military and would have been more credible, and could have hired an expert to analyze Leslie's cell phone to show where he was at the time of the incident.

Once again, Leslie merely speculates that had counsel acted differently, then Leslie would have benefited, but without producing any evidence at the motion for new trial hearing to support how his sister or an expert witness on his cell phone records would have been able to provide him with an alibi. "Decisions about which witnesses to call at trial are matters of trial strategy and tactics, and such strategic and tactical decisions do not amount to deficient performance unless they are so unreasonable that no competent

40

attorney would have made them under similar circumstances." *Jackson v. State*, 318 Ga. 393, 410 (2024) (citation and punctuation omitted). Because Leslie has failed to meet his burden of showing that no reasonable attorney would have declined to call Leslie's sister or an expert witness on his cell phone records to further support his alibi defense, Leslie has failed to meet his burden of demonstrating deficiency and has thus failed to establish this claim of ineffective assistance of counsel. See, e.g., *Lee*, 318 Ga. at 421; *Payne*, 314 Ga. at 334.

8. Finally, Leslie contends that the cumulative effect of the multiple trial court errors and trial counsel deficiencies entitle Leslie to a new trial. Although we have assumed for the purpose of analysis two instances of trial counsel deficiency based on the failure to ensure Leslie's presence at arraignment and the failure to investigate Marcus Patton, Leslie subsequently acquiesced in his absence from arraignment and he has not shown how further investigation of Marcus Patton would have supported his defense. Thus, we conclude that Leslie has failed to show that the cumulative

41

prejudice from these presumed errors likely affected the outcome of his trial.  See, e.g., *Robinson v. State*, 921 SE2d 319, 331 (2025).

*Judgments affirmed. All the Justices concur.*